Thank you, Your Honor. Good morning, Your Honors. Jean Rees, USC Immigration Clinic, Pro Bono Counsel for Mr. Borey Ai. Mr. Ai was born in a refugee camp in Thailand. He came to the U.S. as a refugee at the age of four and has never been to Cambodia. Although he looks Cambodian or Khmer, he is not fluent in Khmer or Cambodian culture and traditions. He has no family in Cambodia. They were all killed in the genocide under the Khmer Rouge regime, with the exception of his mom and aunt, who were forced to work for the Khmer Rouge until they were able to escape with the invasion by Vietnam. Mr. Ai was convicted of murder. He was convicted of a murder he committed when he was just 14 years old. All of these particular factors, his being a cultural outsider, his criminal history, and his family history, converge to create this more than 50 percent risk of torturing Cambodia, a country that is still reeling from genocide. The board's dismissal of Mr. Ai's application rests on ignoring the testimony of expert witness Dr. Peg Levine for two reasons. One is that she was not an expert on deportees to Cambodia, which is irrelevant. And two, because she could not provide raw statistical data to support her assessment of Mr. Ai's risk, which she is not required to do. Mr. Ai's likelihood of torture is not based on his being a deportee, and Dr. Levine was not presented as an expert on deportees to Cambodia. The board effectively imposes an on-account-of factor and then discounts Dr. Levine's testimony as not probative to the irrelevant factor of whether Mr. Ai belongs to a particular group of deportees. Now, in the context of asylum or withholding, a deportee has been held to not be a successful group. But as this court notes in Colby Holder, in CAAT, the board is required to consider all relevant evidence towards the potential for torture. And deportation is how Mr. Ai will be forced into Cambodia. But it is not the reason he faces this probable risk of torture. Counsel, may I ask you about Dr. Levine's testimony? She offered some opinions on various factors going into the likelihood that Mr. Ai would be tortured. She said, you know, there is a 60% chance of torture based on her research, but based on her observation of case studies, she'd say 80%. There's going to be a 70% chance that he'd be picked up by the police. Why? I mean, the immigration judge on the board thought that there wasn't an underlying statistical methodology supporting those conclusions. Why? They didn't put it in terms of Daubert, but why shouldn't we view that as essentially a Daubert-type finding that's not an abuse of discretion? Well, Your Honor, here, the expert witness testimony can be based on scientific, technical, or specialized knowledge. And I acknowledge there's no rules of evidence in immigration court, but this court can look to the federal rules of evidence. So she's basing that assessment on her specialized knowledge, which is based on her research and her direct experience treating victims of torture in a hospital in Cambodia. So in this case, and similarly to the expert in Holder, who based his scholarship and experience and attempted to kind of quantify the risk to Cole by saying, I believe he said 70% chance he would come into police custody and 90% chance he'd be killed by gangs. It's this attempt to quantify, but Dr. Levine has got this specialized knowledge based on her experience and her research and her scholarship and her providing treatment and not on some sort of scientific or technical. And so here also, the finding that she's not an expert on deportee infects this finding about raw statistical data, because in the transcript, the questions are how many Cambodians or how many people are deported to Cambodia, how many deportees have died. And so there's this requirement that she has raw data related to deportees, where an expert witness is allowed to and has, for example, in Colby Holder testified based on scholarship experience. And here she's had her research has consisted of an eight year project of film work in Cambodia, where she interviewed over 1000 survivors of Khmer Rouge, which included Khmer Rouge soldiers. She's taken the testimony of survivors in Khmer Rouge. She's provided direct services to victims of torture and victims of wrongful imprisonment in Cambodia and really has studied and has been present in the country for over 20 years. But all of that, I mean, certainly the expert can testify based on that kind of experience. But if 70 percent is a specific number and 60 and 80 are different specific numbers, you don't think the IJ can say, I'm not going to credit that unless you can. You're giving me a quantitative answer. I want to see some quantitative methodology that leads to that answer. I think that expert she made it clear in her language and she qualified that she was giving. She was trying to assess the risk based on her research and based on her her personal experience. She think it would be higher that she was making this estimate that was more conservative. And I think it's clear it's a demonstrative analysis. For example, the the factor specific to Mr. I. And she says, I've never met a deportee in with the same circumstances as Mr. I. That is very unique and singular factors. And so there's not going to be raw data on people like Mr. I. And so she's it's more of an illustrative attempt to quantify as opposed to based on all the people like Ari, Ari that have created some sort of study. It doesn't exist. And the fact that it doesn't exist, I think, actually establishes that that her expert testimony. Her special knowledge is is helpful to the judge in this case and should have been considered. Regarding the abuse of discretion that your honor raised in this case, the finding that she's not an expert on deportees effectively limits Mr. I's ability to present evidence because the board has limited her probative her being probative to her expertise on deportees, which is not relative relevant and then finding that she's entitled to a little weight because of that. So I think it's it's a higher standard of review because this is tantamount to denying Mr. I. The opportunity to proffer evidence relevant to all the possible reasons why he faces this more than 50 percent risk of torture. So one of the reasons for the risk that the experts spoke about was the risk that people would find out that his mother and aunt worked for the Khmer Rouge. And it wasn't really clear to me what the mechanism was going to be for people finding out. Could you speak to that? Yes. So Dr. Levine talks about how Cambodia is 80 percent rural. It's largely indigenous and it is this community that has suffered genocide. So there's this community, what she I think calls village mode of communication, where a community who has experienced the trauma that that in Cambodia, an outsider, somebody who's passed and who is even more suspicious because he looks Khmer and has obviously left the country for a long time. Finding out who he is, where he's from, who his family is, is a method of communities keeping themselves safe. So they have this village style of communication where somebody would find out, for example, when he first comes into Cambodia, if he's detained, word of mouth would travel through the village system. And she said that this is very common in these kinds of communities that have that are largely indigenous and have experienced genocide. And she I think in her declaration talks about an example where she was filming in a certain area and police showed up and took two of the Cambodian people that she was with and detained them. And she did not know how they even found out she was there or filming. So that is this. And I think that that goes directly to her expertise in working over a long period of time with survivors of torture, with survivors of the Khmer Rouge genocide, including soldiers and how where you are living among your torturers and where everybody's identity is part of keeping you safe. And she explains that and how that's how people would find out. And then the added criminal history that that Mr. I has that people suspected of criminal conduct, people who are known to have criminal histories. And here, Mr. I has a murder conviction. So that's a very important piece of the puzzle that would make him also this heightened danger. And I think she says that combination of her family, his family's history and his criminal history is a lethal combination. It seemed sort of more likely that somehow the criminal history would be conveyed when he was deported, maybe by our government. But because he never lived in Cambodia, I just wasn't sure I understood how he would be connected to his mother and aunt. Like, is there paperwork somehow? I mean, how would that happen? Because it's really the experience of the mother and the aunt that causes the danger, as I understand it, or at least enough to make the danger enough in total. Right. It definitely contributes to him being an outsider and his criminal history and this history with his mom and aunt. But I would note that the board doesn't dismiss his application because he fails to show that anyone would know his history. It's or doesn't dismiss Dr. Levine's testimony. The board says that because, you know, the board first denies Levine because of the raw data issue and the deportee, but then also says he hasn't met his burden because there's a Khmer Rouge tribunal and that the Khmer Rouge is no longer in power. So the board doesn't talk about Dr. Levine's testimony regarding how the mom and the aunt would factor in. Other than there is this, you know, village style of communication where his name, him being a refugee, him having a criminal conviction, him coming from the U.S. would that she thinks that, you know, based on this and based on her research and her experience, they would find out his family connection. In addition, the. The raw statistical data in analogy in in Cole versus Holder, this court found that the that the expert testimony that the board failed to consider the expert testimony testimony and remanded. And one of those things was regarding the fact that country conditions, evidence corroborated the expert testimony and Colby Holder. And here we have the same thing. So similarly, we have this attempt to quantify the risk and we have corroborating evidence. And so the evidence in this case talks about how torture and police custody is very common and it's used for purposes of extracting conviction confessions to impose arbitrary punishment on people who are suspected of wrongdoing to. That there was a widespread detention and torture of people who were considered undesirable, so who were homeless, who had disabilities, somebody who has a known criminal history. And so this all corroborates the information that Dr. Levine testifies to regarding how a community would view Bori being an outsider, having a criminal history, not being fluent, not being able to have family support or anyone to protect him. And she talks about and then and I think that's really undisputed in the record that there is torture by ones in police custody. Can I ask you if we were to agree with you that the that the agency's treatment of Dr. Levine's testimony was not legally sound? I guess the remedy would be to what to remand and tell the board and the IJ you must give greater weight to this testimony and redo the analysis. I mean, I think, Your Honor, that the burden is met with an with the analysis of Dr. Levine's testimony. But I think here the board at minimum I'm sorry here that your honors at minimum can remand so that the board properly considers the extra bit expert testimony for the purposes for which it was offered. And I see I only have that. Yeah, don't worry, you'll you'll get for a bottle. But I guess I'm just not sure what we would say that you must, I don't know, credit as true all of the opinions of Dr. Levine offered, because I mean, obviously, if we were to say that, then, yes, your client wins. I mean, I think here the board did the same thing the board did in Colby Holder. It failed to meaningfully consider all potential evidence. It failed to talk about Mr. I being a cultural outsider. It failed to talk about how his criminal history, how his family history would would increase that risk. And it failed to talk about Dr. Levine's testimony in that respect. And and so here it's it's the you know, I think as is in cold Colby Holder where the court remanded so that the board consider the expert testimony and consider the corroborating evidence. I think that would be appropriate here in this case where the because what the board essentially did is fail to consider Dr. Levine's evidence because they limited her to this category of being an expert on deportees, which is not the reason. And then neglected all the other information regarding his past, his history, how people would find out about him and didn't discuss that or explain why the judge got limited weight on those bases. Let's hear from the government and then we'll give you a couple of minutes for a while. Thank you, Mr. Ready. Good morning. May it please the court. John Holt for the attorney general. Substantial evidence supports that petitioner who was convicted in 1997 of murder did not meet his burden to establish more likely than not that he would be tortured in Cambodia. In this issue, the court is obliged to put on the substantial evidence standard of review glasses and determine whether petitioner met his burden regarding torture. The law is quite clear. The Supreme Court has recently reaffirmed that that is an extraordinarily highly deferential standard of review, and we submit that substantial evidence supports the agency decision. Petitioner comes before the court basically with two hands, a right hand that says that the agency didn't consider Dr. Levine's testimony properly. The left hand stating that the other evidence carries his burden. We submit that that's not the case here.  Levine's testimony. When the court not agree that the most helpful testimony, the most helpful and persuasive evidence of a witness is when the witness presents facts to the court. And that's well established in the law. A witness has to have personal knowledge and experts opinion has to be based on facts. And so here, the real key to this case, the lead in this case, is that the Dr. Levine was not initiated to the facts that were related to or in context of petitioner's petition. What was that? Let me jump in because an expert is not there to present facts. I think you've got that exactly backward. The expert is there to present opinions on matters on which the expert has expertise. And here, Dr. Levine was not offered as an expert on deportees from the United States to Cambodia. And that seems I think your opponent is right. That is, I read the transcript. That's what really seemed to trip up the IJ, especially after government counsel finished with his pretty, pretty outrageous cross-examination. And the stress was on Dr. Levine's inability to recite the raw numbers of deportees who had been sent back to Cambodia and then her inability to quantify how many of them had been murdered. And that had nothing whatsoever to do with the petitioner's theory of why he faced the risk of torture. So I guess I'm left with serious doubts about whether the IJ properly analyzed the import of Dr. Levine's testimony. But it had nothing to do with her being there to offer facts. So help me understand why you think the IJ's reasoning is correct. Perhaps more precisely, the opinion has to be rooted in a foundation of facts that are relevant to the case. Even in 702B, it states specifically that the expert's opinion has to be rooted in facts. And so we submit that that's exactly where the immigration judge and the board focus is the expert's knowledge with respect to the relevant facts. And the relevant facts here were related, first of all, to petitioner being a deportee to Cambodia. And secondly, his being a prisoner. And Dr. Levine conceded that she had not worked with either of these groups. She didn't know any numbers regarding the treatment of U.S. deportees or prisoners. Why do you say that it's relevant that he's a deportee? I don't understand why you started with that again here as what she didn't have knowledge of. Because his theory is he has a criminal history. He has this family history. He doesn't speak the language. None of that is about being a deportee from the United States. Well, he's being a deportee from the United States and he's going back to Cambodia. And his argument was that coming from the United States with a criminal history, he would be suspect because of his past criminal history and be improperly accused of crimes in Cambodia. And so the fact that he was a deportee was really a very significant aspect of the assertion of the reason why he would be subject to torture. But it seemed like his theory was more like I have a criminal history and I have this family history. And it seems like those things could have been true of someone who was in Cambodia the whole time. And the criminal history is an important point. And the family history is an important point. And the court addressed both those. The important point with respect to Dr. Levine's testimony is she had no knowledge and she had never worked with a population of people that had been criminals and been deported to Cambodia. And regarding the family history, the court specifically addressed the circumstances regarding the family history, i.e., they said, first of all, the Khmer Rouge is no longer in power. There's a tribunal that has been instituted to hold accountable leaders that are responsible for the Khmer Rouge crimes. And then the court said specifically that any concerns about being persecuted because of the Khmer Rouge connection, the family connection, is speculative. Probably the best evidence to support that particular point, and the agency cited that, was indeed in 2016, the mother returned to Cambodia and stayed there a month and was unharmed. But she came the whole time, didn't she? I mean, he would have to go back and live there. The point is that it is speculative that he would be subject to persecution or torture. But his mother, who had an unfortunate history of working as a conscript laborer for the Khmer Rouge, was there and had absolutely no problems at all. So I think the agency did address that circumstances of the family quite clearly. The other important point is… Am I remembering correctly, though, that the mother spent a month essentially in hiding? Well, she was there. She was there the whole time. She didn't go there just to hide. She didn't say that she went there just to hide out for a month. So she had a physical presence in Cambodia. She returned there freely and voluntarily. And she had no problems and she had no issues as a result of any connection that she had over 40 years ago with the Khmer Rouge. Now, Judge Miller asked specifically questions about the statistics. And here I think it's important to appreciate what this case is not. This case is not a case where the judge exercised his Dalbert authority as gatekeeper to exclude expert testimony. Petitioner, in her brief, argues that the case is relating to exclusion of testimony. This is a case where the judge admitted the testimony. Not only did he admit the testimony, but he admitted on page 509 through 515 the expert's report. And what the judge focused on was the factual basis for that opinion. And so she asked the expert, now, you've given these numbers, as Judge Miller pointed out, you were between 60, 70, 80 percent that the petitioner would be tortured. And she said, now, where do you get these numbers? And she said, well, that's in the World Justice Project report. And if you look at pages 179 through 386, there are no numbers in there to substantiate at all the statistical data that Dr. Levine presented. May I ask, even if that was, even if the rationale you just articulated would support discounting, maybe discounting altogether the numerical opinions offered by the expert, the expert also offered a lot of qualitative judgments about what Cambodian society is like. And as my colleagues have alluded to, the difficulty that Mr. Rai would have fitting into Cambodian society, if returned, and the fact that he would likely come to the attention of the police. How do the problems with her numbers or the lack of a quantitative methodology justify discounting those parts of her opinion? Your Honor, your question goes to an assertion by petitioner that the immigration judge failed to consider all the evidence. There are three responses to that. On page 51 of the record, the immigration judge states specifically, this is, I want to summarize all of the evidence. The judge then detailed each of the exhibits and the testimony of the witnesses. On page 60, the judge, after stating the factual, all of the evidence went to the law and said, the law commands that all the evidence be considered in determining whether or not they're tortured. Then third, the immigration judge on page 63 specifically said, now, considering all of the evidence, I determined that petitioner did not meet his burden. So three times, both stating the facts, the law, and the application of the law to the facts, the immigration judge stated the correct legal standard. Fair enough, but just because she said she was considering all the evidence, I think the question is, if you accept that part of the expert's testimony, and I'm not sure she gave a reason for rejecting it, if you accept the idea that he's not going to fit in, he's going to come to the attention of the police, he's going to get arrested at some point. The board seems to have acknowledged that if you're arrested in Cambodia, you're likely to be tortured. Why wouldn't those two facts dictate the conclusion that he's more likely than not to be tortured if returned? Well, the board also on page four specifically noted that there was no evidence that U.S. deportees are imprisoned immediately upon return to Cambodia. And Dr. Levine, again, said she had no knowledge with respect to that matter because she had never worked with prisoners that had been deported. So we would submit that the key point here is the facts of the case that relate to his assertion of persecution or torture based upon the fact that he was a deportee and a criminal. But other deportees might speak the language. I mean, he's really not saying that the problem is that he's a deportee. He says he doesn't speak the language, he's going to be suspicious, people don't know him, and then they're going to look into him and put him in prison and torture him. And the fact that he's a deportee doesn't really come into that. So I still think there seems to be an error here in rejecting the relevant testimony because of this irrelevant issue. If I may, Your Honor, I would say the fact that he's a deportee is block number one in the facts relating to his assertion of the reason of the torture. He's saying that he's going to be subject to torture because he's a deportee. Where does he say that he's going to be subject to torture because he's a deportee? Because he's a deportee that, if I may, first of all, that's a criminal convicted of murder. And secondly, because of his mother working as a conscript for the Khmer Rouge more than 40 years ago. Right, but both of those things could be true of someone who's not a deportee. I don't think he ever says he's going to be tortured because he's a deportee in particular on its own. The argument of petitioner at the board and before the immigration judge was that he was vulnerable to torture because of his criminal history and because of his mother's relationship with the Khmer Rouge. And that all would come to light because he was being removed to Cambodia. Even Dr. Lavigne... Can I ask you another thing? When I asked you a question earlier, you spoke about his mother returning to the country. But if I'm reviewing this BIA decision correctly, I don't see any mention of that in the BIA opinion. Dr. Lavigne, am I right that the BIA does not rely on that as a reason to think that he is safe despite his family history? Well, the immigration judge specifically addressed the mother's testimony and detailed her testimony. And I submit the board did not need to address every possible assertion of a fact that was related to the torture. Not every fact. What they did is they responded to petitioners' assertion that the immigration judge had erred in not weighing properly Dr. Lavigne's testimony. With regard to his vulnerability for torture, even Dr. Lavigne's testimony militates somewhat against petitioner's claim. She conceded that petitioner could live free of torture in urban areas, in Phnom Penh in particular, in a tourist area. She said that he'd have to live in a tourist area and try to pass himself off as a tourist. I mean, I took the point of that to be that it's simply not realistic to think that a person could spend their life passing themselves off as a tourist in a country. Isn't that the more natural conclusion from that fact? I mean, why is that a reasonable thing to expect him to do? We submit that that concession by the good Dr. Lavigne is an important concession, particularly when the person says that this person can live in a metropolitan area and not be subject to torture. So we submit that undermines petitioner's claim. The bottom line we would submit is that the board here and the agency's decision are rooted in the consideration of the facts relevant to the risk of torture. And those facts are an ounce of relevant facts are worth a pound of general knowledge about the conditions in Cambodia. And the court considered all of the evidence that they stated repeatedly on pages 51, 60 and 63 and concluded that neither because he was a convicted murderer or the fact that his mother had worked for the Khmer Rouge over 40 years ago as a conscript would result in his torture. We submit the standard. Thank you. Let's put two minutes on the clock. Thank you. So regarding this issue of Dr. Lavigne's conceding that Mr. I would be safe in Phnom Penh, that that's not the case. And I know that Judge Miller has spoken to that. But I will just say that the board doesn't say that Mr. I should be denied cap because he can relocate to Phnom Penh safely. So that's not an issue before before this court. I think the fixation and even the government's fixation on him being a deportee in their argument just reveals this lack of can meaningful consideration to all the other evidence in the record that compels this conclusion that because of under this individualized analysis and these factors of being a cultural outsider, criminal history and family history that give rise to more than a 50 percent chance of torture for Mr. I and even the court and Colby holder says this kind of catch all phrase saying that I've considered all the evidence isn't sufficient when there is evidence that is not mentioned failing to mention highly probative or potentially dispositive evidence. And Dr. Lavigne's testimony regarding the many factors specific to Mr. I that increases risk of torture to that of 50 beyond 50 percent is potentially dispositive evidence. And I think that that regarding this the raw data it is it is within the context of this fixation on being a deportee because a group of deportees perhaps there could be data raw data about that. But in this particular case Dr. Lavigne's assessment is specific to Mr. I and and the Daubert kind of scientific analysis requirement isn't doesn't really lend itself to an expert who's talking about human rights violations and country conditions because she's not a scientific technical expert in that context. And so I think here the board disregards relevant dispositive testimony for irrelevant reasons being a deportee and Dr. Lavigne's not required to have a scientific technical raw data for her attempt to quantify this risk that Mr. I faces that she said she's saying it's more than 50 percent. She's saying it's she's trying to give a demonstrative number. And I think that that's totally within the realm of appropriate expert witness in this case. And I think I think your honors for your attention today. Thank you very much. And thank you counsel for being willing to accept this case on a pro bono basis. We very much appreciate your assistance.  The case just argued is submitted.
judges: Watford, Friedland, Miller